236 F.3d 187 (4th Cir. 2000)
 GRINNELL FIRE PROTECTION SYSTEMS COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
SPRINKLER FITTERS LOCAL UNION 669, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO; UNITED ASSOCIATIONOF JOURNEYMENAND APPRENTICESOF THE PLUMBINGAND PIPEFITTING INDUSTRYOF THE UNITED STATESAND CANADA, AFL-CIO, Intervenors.
SPRINKLER FITTERS LOCAL UNION 669, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO; UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICESOF THE PLUMBINGAND PIPEFITTING INDUSTRYOF THE UNITED STATES AND CANADA, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
GRINNELL FIRE PROTECTION SYSTEMS COMPANY, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GRINNELL FIRE PROTECTION SYSTEMS COMPANY, SPRINKLER FITTERS LOCAL UNION 669, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO; UNITED ASSOCIATIONOF JOURNEY MEN AND APPRENTICES OF THE PLUMBINGAND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO, Respondents.
 No. 99-1754 No. 99-1900 No. 99-2212.
 UNITED STATES COURT OF APPEALS, FOR THE FOURTH CIRCUIT.
 Argued: June 8, 2000.
Decided: December 29, 2000.
 
 On Petitions for Review and Cross-application of Orders of the National Labor Relations Board. (5-CA-24521, 5-CA-25227, 5-CA-25406)[Copyrighted Material Omitted]
 COUNSEL ARGUED: Joel Harvey Kaplan, SEYFARTH, SHAW, FAIR-WEATHER & GERALDSON, Chicago, Illinois, for Grinnell. David Arthur Fleisher, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. William Walter Osborne, Jr., OSBORNE LAW OFFICES, P.C., Washington, D.C., for Local 669, et al. ON BRIEF: Christopher A. Weals, Charles F. Walters, SEY-FARTH, SHAW, FAIRWEATHER & GERALDSON, Washington, D.C., for Grinnell. Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Robert Matisoff, Nicholas Femia, O'DONOGHUE & O'DONOGHUE, Washington, D.C., for Local 669, et al.
 Before NIEMEYER and KING, Circuit Judges, and Irene M. KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.
 Petitions for review denied and cross-application for enforcement granted by published opinion. Judge King wrote the opinion, in which Judge Keeley concurred. Judge Niemeyer wrote a concurring and dissenting opinion.
 OPINION
 KING, Circuit Judge:
 
 
 1
 Grinnell Fire Protection Systems Company ("Grinnell") petitions this Court, pursuant to 29 U.S.C. § 160(f), to review the decision of the National Labor Relations Board (the "Board") that Grinnell engaged in unfair labor practices, in violation of the National Labor Relations Act ("the Act"). The Board, by its May 28, 1999 Decision and Order ("Order"),[1] upheld the decision of its Administrative Law Judge ("ALJ").[2] The Order determined that Grinnell's implementation of its final contract offer, after failing to reach a collective bargaining agreement ("agreement") with the representative of its employees, constituted an unfair labor practice because "there was no impasse in bargaining."
 
 
 2
 Grinnell's employees are represented by Local 669 ("Local 669") of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry (collectively"the Union"). The Union also petitions for our review of the Order insofar as the Board concluded that Grinnell did not engage in unfair labor practices prior to the company's implementation of its final contract offer. For the reasons explained below, we deny the petitions for review filed by Grinnell and the Union, and we grant the Board's cross-application for enforcement of its Order.
 
 I.
 
 3
 After its unsuccessful attempt to negotiate a new agreement with the Union, Grinnell, on April 14, 1994, declared an impasse and implemented its final contract offer. Immediately thereafter, the Union filed unfair labor practice charges against Grinnell with the Board. Our summary of the relevant facts underlying this dispute, recounted below, is largely drawn from the ALJ's decision of January 16, 1997.
 
 A. BACKGROUND
 
 4
 Grinnell, a subsidiary of Tyco International Ltd. ("Tyco"), is engaged in the design, fabrication, sale, and installation of fire sprin- kler systems. For many years, Grinnell had been represented in its collective bargaining with the Union by a multiemployer bargaining group known as the National Fire Sprinkler Association (NFSA), a trade association of over 150 fire sprinkler contractors. In 1992, the Union had instituted a program known as "targeting" to assist signa- tory contractors, including Grinnell, in competing with lower-cost non-union contractors. Under the Union's targeting program, the par- ties were sometimes able to negotiate concessionary wage rates, which permitted a NFSA member to pay lower wages or other bene- fits to journeyman fitters on a project-by-project basis in certain geo- graphical areas. Jobs that included targeting of wages were referred to as "targeted" jobs. Under the program, the Union retained final authority to grant an employer's request to target a project with a reduced rate.
 
 
 5
 From the inception of the targeting program, Grinnell, the largest fire sprinkler manufacturer and installer in the United States, had been its primary user. However, in May 1993, the Union added a new requirement to its targeting program: in order to participate in target- ing after June 1, 1993, a company was obliged to commit to remain part of the NFSA multiemployer bargaining group through negotiation of the next agreement (or, in the alternative, consent to be bound by the agreement negotiated between the Union and NFSA effective April 1, 1994).
 
 
 6
 Grinnell declined to accept this new condition; as a result, the Union withdrew Grinnell's participation from the targeting program. Grinnell responded with a letter, dated September 22, 1993, in which it revoked NFSA's bargaining authority, provided notice of termination of the existing agreement between the parties (due to expire March 31, 1994), and requested immediate negotiations with the Union for a new agreement.
 
 B. THE NEGOTIATIONS
 1. The Early Negotiations
 
 7
 On January 28, 1994, Grinnell provided the Union with a proposal for a new agreement, its first proposal following Grinnell's revocation of NFSA's bargaining authority. This proposal contained significant changes to the existing agreement in the areas of wages, job classifi- cations, benefits, and pension plans.[3]
 
 
 8
 Grinnell and the Union thereafter entered into contract negotia- tions, with the first session being conducted on March 17, 1994, in Bethesda, Maryland. At this first session, Grinnell's counsel, Peter Chatilovicz, acted as its chief negotiator. Chatilovicz explained Grin- nell's reasons for withdrawing bargaining authority from NFSA, and he expressed the company's desire that, by bargaining independently with the Union, it would be able to reach an agreement that would resolve its major competitive problems. Grinnell then presented a new proposal to the Union, revised somewhat from its January 28, 1994 proposal.
 
 
 9
 Under its revised proposal of March 17, Grinnell would possess the option to apply targeting to any project where there was non-union competition. The fixed targeting rate would be tied to the journeyman wage rate in the particular state, but it would be no lower than 65% of that rate. Chatilovicz made clear to the Union that Grinnell's goal was to control targeting, rather than leave the matter to the Union's discretion. Grinnell also proposed replacing the existing benefits plan with one common to Tyco employees. While the parties engaged in no other significant discussions, they reached consensus that any new agreement would be for a term of three years. The Union requested an overnight recess so that it could study Grinnell's revised proposal.
 
 
 10
 The parties met again the next day, March 18, to discuss Grinnell's revised proposal. During this meeting, Grinnell offered to increase the minimum targeting rate to 75% of the journeyman wage rate, up from the prior offer of 65%. The applicability of these rates would not to be subject to grievance procedures, but would be within Grinnell's sole discretion to impose -- immune from all review by the Union absent allegations that the company had misused its targeting author- ity. The Union did not then indicate whether it could accept Grinnell's targeting terms, but it did present a counter wage proposal calling for incremental annual increases in the journeyman hourly rate and a $.25 increase in the differential for foremen. The parties agreed to meet again in ten days, on March 28, 1994.
 
 
 11
 Shortly thereafter, an important change of circumstances occurred. On March 22, 1994, the Union issued to its members a strike notice directed at Grinnell and NFSA. Upon receiving the notice, Grinnell sought a five-day renewable extension of the existing agreement, which the Union denied. By letter dated March 24, 1994, Grinnell informed its employees that, in the event of a strike, it would hire per- manent replacement workers. Ensuing controversy within the Union caused its president to place Local 669 in trusteeship, and the negoti- ating session scheduled for March 28, 1994, was cancelled.
 
 
 12
 Effective March 28, 1994, Tommy Preuett, a former president and business manager of Local 669, was appointed as the Union's trustee. As trustee, Preuett was empowered to manage the Union's affairs, including the negotiation of new agreements with NFSA, Grinnell, and other independent contractors.
 
 2. Preuett Begins to Bargain[4]
 
 13
 On March 30, 1994, the first bargaining session between Grinnell and the Preuett-led Union took place in New York City.[5] Because Preuett had not attended the earlier sessions, Grinnell reviewed its reasons for revoking NFSA's bargaining authority and seeking improved terms in a new agreement with the Union. Grinnell also expressed concern that the Union would reach an agreement with NFSA that failed to address its problems, then expect Grinnell to accept the terms of the NFSA agreement, or one substantially similar.
 
 
 14
 Preuett was conciliatory, stating that the Union wanted to work with Grinnell to achieve an agreement, that it did not want a strike, and that a strike was not planned for April 1, 1994. Additionally, Pre- uett asserted that the Union was against a uniform targeting rate because the resultant loss of flexibility would permit non-union con- tractors to anticipate Grinnell's wage expense and adjust for it. On health and welfare benefits, Preuett related that the Union was reluc- tant to accept the Tyco plan because it lacked portability and reciproc- ity, and also because Tyco did not provide health coverage for retirees. Chatilovicz responded that Grinnell understood the Union's apprehension and that Grinnell was "not wedded" to the Tyco plan. However, Grinnell wanted an agreement that would nonetheless cut its costs of providing health, welfare, and pension benefits. Preuett asked Grinnell for a thirty-day extension of the existing agreement. Grinnell refused, indicating that it wanted to finish bargaining as soon as possible.
 
 3. The April 7, 1994 Session
 
 15
 The next bargaining session was held on April 7, 1994, in New York City, with Preuett again representing the Union. Three separate mini-sessions actually occurred that day -- in the morning, in the afternoon, and in the evening. On that same day, the Union was again conducting negotiations for a new agreement with NFSA at the same hotel.
 
 
 16
 a.
 
 
 17
 During the morning session on April 7, Preuett presented a com- plete proposal on behalf of the Union. This proposal called for the same wage increases included in the Union's previous offer, and it proffered a targeting plan whereby a Union agent and a Grinnell rep- resentative in each geographical district would establish a target rate for the following year based on the local marketplace, with a mecha- nism to protect Grinnell from arbitrary action by Union representa- tives. This proposal, however, would not be accomplished until a new agreement was in effect, and it would not guarantee the targeting rates that Grinnell desired.
 
 
 18
 The Union's proposal also provided for continued company contri- butions to health, welfare, and pension plans, as well as industry pro- motion and training funds contributions. Under the Union's proposal, the employer's contribution to the health and welfare fund would have been frozen at a $3.75 per-hour rate for the term of the agree- ment; pension contributions would have remained at the prevailing rate of $2.20 in 1994, $2.30 in 1995, and $2.40 in 1996; with a flat $.75 contribution to supplemental pension funds ("SIS") in the states where they existed. After a break in the morning session, Grinnell made a detailed response to the Union's proposal, continuing to insist that any agreement include a fixed targeting rate of 75%. Grinnell also wanted reduced health, welfare, and pension contributions, and it again expressed its desire to eliminate all contributions to SIS, industry promotion, and training funds.
 
 
 19
 b.
 
 
 20
 During the afternoon session on April 7, the Union proposed a freeze on wage rates for the term of the agreement. It further proposed that, within sixty days, a committee would meet to set targeting rates for the next year and, after a review of the results, for the following year as well. The Union also proposed separate rates for industrial, commercial, and residential jobs; health and welfare contributions of $3.75, $3.50, and $3.25 per- hour over the three years of the agree- ment; a $.50 per-hour SIS contribution, where applicable, in the first year, with $.10 increases in each of the two succeeding years; and a reduced training fund contribution. Following an afternoon break, Grinnell again countered, reiterating its proposal that there be a fixed targeting rate of 75%, with the rate to be reviewed and possibly adjusted after a year. It offered a choice between the Tyco health plan and a $2.25 per-hour contribution to another health plan acceptable to the Union. In the pension area, Grinnell proposed to implement either its Tyco 401(k) plan or to make a $1.20 per-hour contribution to another plan, with no SIS contributions.
 
 
 21
 c.
 
 
 22
 The parties recessed on the afternoon of April 7, reconvening that evening for a third mini-session. The Union then offered amended proposals on the hiring of apprentices, overtime, and training fund contributions, proposing a contribution of $2.20 per-hour to the pen- sion plan, a $.50 SIS contribution for the three-year term of the agree- ment, and health and welfare contributions of $3.75, $3.40 and $3.40 per-hour. After an evening break, Grinnell indicated that it would agree to the Union's overtime and training fund proposals, along with some of the language on apprentices, but stressed that targeting had to be under its control. Chatilovicz prepared a chart outlining the remaining issues, including wages/targeting, health and welfare, pen- sion, and SIS.
 
 4. The April 8, 1994 Session
 
 23
 The next bargaining session was conducted on April 8, 1994, again at the New York City hotel where Preuett and the Union were negoti- ating simultaneously with NFSA. On that occasion, Preuett proposed a targeting agreement under which Grinnell could lower wages on certain types of projects, but Grinnell reiterated the importance of a fixed targeting rate and stated that the 75% proposal was "final[.]" Preuett responded that the Union was flexible on"economics," but needed to retain "control of its destiny" in approving the targeting rates.
 
 
 24
 The parties also discussed the other open issues. The Union stated that its primary goal was that benefits be uniform and flexible. It indi- cated a desire to do further research on the proposed Tyco 401(k) plan and decide whether it was "doable." Preuett also stated that, while there were issues the parties did not agree on, the Union was there to achieve an agreement. The April 8 session ended with an understand- ing that the parties would again meet on April 12, with Grinnell ask- ing for specific responses from the Union on the issues of targeting, benefits, and SIS.
 
 5. The Last Session: April 12, 1994
 
 25
 The bargaining session of April 12, 1994, was held at the Union's offices in Washington, D.C.[6] During this April 12 session, Chatilovicz told Preuett to "stop bullshitting," accused him of "playing games," and suggested getting a federal mediator to resolve matters. Preuett denied that he was playing games, stated that the Union wanted uni- formity in the industry and had made proposals to this end, and asserted that the Union was making concessions on several issues. Chatilovicz agreed that Preuett had made some movement, but asked for the Union's best proposal. Chatilovicz then averred that he recog- nized the Union's desire for uniformity and that he would not be sur- prised if Preuett needed to have the same agreement the Union had reached with NFSA.
 
 
 26
 Preuett was accompanied to the April 12 session by Paul Green, a benefits expert. Green asked a series of questions of Grinnell about the Tyco benefits plans. After a short while, Chatilovicz asserted that Grinnell understood that the Union was not inclined to move away from the uniform health and welfare plan and that the Union was not interested in the Tyco plan; Chatilovicz also responded angrily to what he considered to be Green's unwelcome intrusion into the negotiations. Preuett explained that the Union had concerns about the Tyco plan. When Chatilovicz asked if there were any way the Union could accept the Tyco plan, Preuett responded that he was not sure, but the Union was not yet saying "no."
 
 
 27
 Green continued to ask questions, but Chatilovicz brushed them aside, convinced of Preuett's disinterest in the Tyco plan. Preuett contradicted Chatilovicz's perception, noting that the parties were bar- gaining. Chatilovicz responded that if the Union wanted to bargain it should "stop the bullshit." Chatilovicz asserted that if the Union wanted to propose the benefits package from the NFSA agreement then Preuett should do so, but it was insulting to bring in Green to pick at the Tyco plan. After a discussion of the wage rates contained in the new agreement the Union had made with NFSA, Chatilovicz again asserted that he knew the Union wanted a uniform agreement. Preuett retorted that the Union did not want targeting rates determined by fixed percentages.
 
 
 28
 Following a lunch break on April 12, 1994, Grinnell presented the Union with its "final proposal" on the remaining issues. This proposal called for a freeze in wage rates for foremen at the 1994 level, a fixed targeting rate of 80% of the journeyman wage on any job with com- peting non-union bidders, the Tyco health plan with some modifications, the Tyco 401(k) plan with a $200 per-year service credit, up to a maximum of $1000, and no SIS contributions. Chatilovicz advised Preuett that if the Union could not accept this proposal, it should give Grinnell its best and final proposal. Preuett said the Union would consider it.
 
 
 29
 After a ninety-minute break, the Union made another counter proposal to Grinnell, resubmitting its health, welfare, and pension proposals, and offering reductions in the commercial wage rates for targeted jobs of $1 in thirty states and $1.50 in another seventeen states. Preuett maintained that this proposal would lower Grinnell's costs tremendously, making it more competitive, and that the Union was willing to meet indefinitely in an effort to achieve an agreement. Chatilovicz indicated that Grinnell would examine the proposal on the assumption that it was the Union's last offer. In response, Preuett expressly asserted that this proposal was not the Union's last offer, that the Union desired to reach an agreement, and that he was flexible. Preuett asserted that Chatilovicz had mentioned absolute and final offers, trying to push the bargaining to an impasse. From the Union's standpoint, however, an impasse was undesirable, and Preuett vowed not to give up easily.
 
 
 30
 Chatilovicz acknowledged that both parties had worked hard to reach an agreement but that, while the Union's proposal provided some savings, it was not enough. Chatilovicz then informed Preuett that he would be in his office in the event the Union changed its view. Preuett asked how far apart they were and in which states Grinnell needed movement. After the parties discussed the differences in the wage rates, this bargaining session terminated.
 
 
 31
 At about 6 p.m. that evening, Preuett telephoned Chatilovicz at the latter's office. When Preuett suggested another meeting the following day, Chatilovicz asked what the Union was going to propose. Preuett responded that he would attempt to get Grinnell to raise its rates. In response, Chatilovicz asserted that the Union had Grinnell's final proposal and Grinnell was not willing to change further with respect to wages and benefits. Preuett asked about bringing in a federal media- tor, but Chatilovicz claimed that mediation would be futile unless the Union was willing to come down to Grinnell's proposed rates. Preuett asked if Grinnell's rates were "carved in stone," and Chatilovicz assured him that they were. Preuett then said that he hoped Grinnell would change its view, and "maybe they could get together down the road." Grinnell, 328 N.L.R.B. No. 76 at 12.
 
 
 32
 Later that evening, the Union called a nationwide strike against Grinnell. Thereafter, by letter of April 13, 1994, Grinnell informed both its employees and the Union that it was implementing its final contract offer, effective the next day, and further indicated that it would hire permanent replacements for striking employees.
 
 C. THE BOARD PROCEEDINGS
 
 33
 On April 15, 1994, the Union filed unfair labor practice charges with the Board against Grinnell, alleging, among other things, that the company had failed to bargain in good faith. The Union specifically asserted that Grinnell had unlawfully implemented its final contract offer before the parties had reached a good faith impasse. The Board's General Counsel, on receiving the Union's charges, issued a com- plaint dated March 29, 1995.[7] The allegations were that Grinnell had engaged in violations of sections 8(a)(1), (3), and (5) of the Act.[8]
 
 
 34
 The ALJ conducted a proceeding consisting of twenty-two days of hearings, commencing on October 16, 1995, and ending on March 28, 1996. The ALJ then found that "no genuine impasse[in bargaining] existed." Grinnell, 328 N.L.R.B. No. 76 at 14. The decision of the ALJ, filed January 16, 1997, found violations against Grinnell under sections 8(a)(1) (for implying to striking workers that they would be permanently replaced), and 8(a)(5) (for implementing its final con- tract offer before impasse had been reached). The ALJ recommended dismissal of the section 8(a)(3) charge of unlawfully discharging striking employees, based on his conclusion that Grinnell's April 13, 1994 letter did not constitute an effective discharge. Thereafter, on May 28, 1999, a divided Board entered the Order affirming, inter alia, the ALJ's finding that Grinnell "violated Section 8(a)(5) and (1) of the Act by unilaterally changing terms and conditions of employment through the implementation of its final contract offer when there was no impasse in bargaining." See Grinnell , 328 N.L.R.B. No. 76 at
 
 1.
 II.
 
 35
 We review the Order to determine if it is supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." NLRB v. Peninsula Gen. Hosp. Med. Ctr. , 36 F.3d 1262, 1269 (4th Cir. 1994) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). We have recognized that while "substantial evidence" is more than a scintilla, it may also be less than a preponderance. AT&T Wireless PCS, Inc. v. City Council of City of Virginia Beach, 155 F.3d 423, 430 (4th Cir. 1998); NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir. 1997). With regard to the Board's application of the law to the facts, a reviewing court must affirm the Board's conclusions if they are reasonable and consistent with the Act. NLRB v. Yeshiva Univ. , 444 U.S. 672, 691 (1980).
 
 
 36
 We accord due deference to the reasonable inferences that the Board draws from the evidence, NLRB v. Brown, 380 U.S. 278, 292 (1965), regardless of whether we might have reached a different conclusion in the first instance. Universal Camera , 340 U.S. at 488. Of course, courts "remain the final authorities on issues of statutory construction." Shanty Town Assocs. Ltd. v. EPA , 843 F.2d 782, 790 (4th Cir. 1988).
 
 III.
 A.
 
 37
 Defining the section 8(a)(5) obligation "to bargain collectively," section 8(d) of the Act requires, among other things, that the employer and employees "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and condi tions of employment . . . but such obligation does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). See generally NLRB v. American Nat. Ins. Co., 343 U.S. 395 (1952). Because the duty to bargain does not impose an obligation to agree, at some point during bargaining a party may conclude that further meetings and discussions will not produce an agree- ment and it can declare that an impasse has been reached. If the party declaring an impasse does so in good faith, and if its conclusion is justified by objectively established facts, then the statutory duty to bargain collectively is satisfied. See Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 544 n.5 (1988); AMF Bowling Co., Inc. v. NLRB, 63 F.3d 1293, 1299 (4th Cir. 1995).
 
 
 38
 Generally speaking, section 8(a)(5) of the Act prohibits an employer from unilaterally instituting changes regarding wages, hours, and other terms and conditions of employment before reaching a good-faith impasse in bargaining. NLRB v. Katz , 369 U.S. 736, 747 (1962). An impasse exists when the collective bargaining process has been exhausted and, "despite the parties' best efforts to reach an agreement, neither party is willing to move from its position." Excavation-Construction, Inc., 248 N.L.R.B. 649, 650 (1980). A party claiming an impasse as the basis for its unilateral actions bears the burden of proving that an impasse in negotiations actually existed. Tom Ryan Distributors, Inc., 314 N.L.R.B. 600, 604 (1994).
 
 
 39
 Determining whether an impasse in bargaining was actually reached is obviously an inquiry that is fact-intensive. Even though the historical circumstances surrounding the various negotiations in this dispute are generally uncontroverted, the ultimate question of whether an impasse existed on April 12, 1994, can only be answered by evaluating and weighing that evidence, and by examining the relevant legal authorities. As the Court of Appeals for the District of Columbia has recognized, the question of the existence of an impasse is one "of fact involving the Board's presumed expert experience and knowledge of bargaining problems." Dallas Gen. Drivers Local Union No. 745 v. NLRB, 355 F.2d 842, 844 (D.C. Cir. 1966). Indeed, the court recognized that "few issues are less suited to appellate judicial appraisal . . . or better suited to the expert experience of a board which deals constantly with such problems." Id. at 844-45.
 
 B.
 
 40
 The relevant criteria for determining the existence of an impasse were explicitly identified by the Board in Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967):
 
 
 41
 The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the con- temporaneous understanding of the parties as to the state of negotiations are all relevant factors [the trier of fact should consider] in deciding whether an impasse [existed.]
 
 
 42
 Id. at 478. We review those criteria seriatim.
 
 1. Bargaining History
 
 43
 Although the parties here -- Grinnell and the Union -- have a rela- tionship that goes back several decades, this was the first instance where Grinnell was bargaining independently and directly with the Union. In the past, Grinnell had committed itself to bargain through and be bound by the NFSA. As the ALJ correctly found, such a short bargaining history "would dictate giving the parties a fuller opportu- nity to effect an agreement than occurred here." Grinnell, 328 N.L.R.B. No. 76 at 12. This is especially true considering the exten- sive changes to the benefits and wages of the employees that Grinnell was proposing. See Harding Glass Co., 316 N.L.R.B. 985, 991 (1995).
 
 2. Good Faith and Length of Negotiations
 
 44
 We accept the view of the ALJ and the Board that, prior to the uni- lateral implementation of its final contract offer, Grinnell bargained in good faith with the Union.[9] See AMF Bowling, 63 F.3d at 1299. In AMF, we stated that good faith is a "powerful fact" weighing in the employer's favor, "from which we may infer that[the employer] made a bona fide effort to reach agreement." Id. However, section 8(a)(5) of the Act can be violated by an employer"without also find- ing the employer guilty of over-all subjective bad faith." Katz, 369 U.S. at 747.
 
 
 45
 Although Grinnell bargained with the Union in good faith, on April 12, 1994, against the background of the agreement reached between the Union and NFSA (and Grinnell's understanding of the consequences of that agreement), the negotiations between Grinnell and the Union clearly changed. Notwithstanding that Preuett had been bar- gaining on behalf of the Union for only two weeks, and in that period significant progress had been made, Grinnell was unwilling to negotiate further. During Preuett's stewardship, there were only four bar- gaining sessions, totalling "no more than 13 hours of actual bargaining with much of the 4-hour session on March 30 devoted to introductions and general discussion." Grinnell, 328 N.L.R.B. No. 76 at 13.[10]
 
 
 46
 Of course, the limited duration of the relevant negotiations does not, standing alone, contravene our conclusion that Grinnell negotiated in good faith until April 13, 1994, when it unilaterally implemented its final contract offer. See, e.g., Lou Stecher's Super Markets, 275 N.L.R.B. 475, 476-77 (1985) (good faith impasse existed after only three bargaining sessions). However, the brevity of the relevant bargaining period gives the factual determination that no impasse existed -- made by both the ALJ and the Board-- a pronounced appearance of reasonableness.
 
 3. Importance of the Issues Remaining
 
 47
 In support of its assertion that negotiations had reached impasse, Grinnell points to allegedly unresolvable issues that remained, emphasizing the significance of those issues. It also points out that, when the issues separating the parties are of great importance to one or both of them, a finding of impasse is more likely. See Hyatt Regency Memphis, 296 N.L.R.B. 259, 315-16 (1989), enforced, 944 F.2d 904 (6th Cir. 1991) ("[impasse] may be reached even after a few bargaining sessions where the subject of the change is of supreme importance to an employer with respect to its ability to compete.").
 
 
 48
 Here, Grinnell urges that it repeatedly sought wage relief and a new targeting program that would give it (rather than the Union) the uni- lateral right to reduce wages on jobs with non-union bidders. Grinnell consistently maintained that a fixed targeting rate was essential for a settlement. The Union, on the other hand, insisted on retaining the right to control targeting. Purporting to have seen no movement on these key issues, Grinnell made its final contract offer to the Union on April 12, 1994. This offer increased the targeting rate and enhanced health and pension benefits. The Union countered with a proposal substantially similar to the one it had made earlier that day, with minor modifications. Based on its perception that the Union was not making any movement, Grinnell argues that it"reasonably and objectively concluded that the parties were deadlocked."
 
 
 49
 Grinnell's characterization of the negotiations is unavailing. As the Board properly concluded, this was a typical labor dispute over a "matter of dollars," and there was no reason to believe that the parties' disagreements could not be resolved with further bargaining. Indeed, the parties had made significant strides towards reaching an agreement during the period that Preuett functioned in his role of chief Union negotiator. For example, Grinnell had increased its proposed targeting rate from 65% to 80%. On health, welfare, and pension contributions, Grinnell had retreated from its proposal to implement the Tyco regime, indicating that it would accept the Union's proposal if the company's contributions were reduced.
 
 
 50
 The Union had also demonstrated continuing willingness to com- promise. It had made two proposals that reduced Grinnell's health, welfare, pension, and SIS contributions. It had also brought in Green, a benefits expert, to study the Tyco plan.[11] On wages, the Union had proposed that local wage rates be fixed by mutual agreement, and it later dropped a proposal for a wage increase. Lastly, at the final bargaining session on April 12, 1994, the Union proposed wage reductions in some states and asked for identification of those states where Grinnell needed further reductions. In sum, on April 12, 1994, as the Board found, the Union's positions were clearly flexible. Further negotiations could well have led to an agreement encompassing all the outstanding issues.[12]
 
 
 51
 4. Contemporaneous Understanding of the Parties
 
 
 52
 Grinnell insists that an impasse existed on April 12, 1994, because, in its view, the Union would not accept an agreement whose terms differed significantly from those in the Union's new agreement with NFSA. Grinnell also asserts that the Union's only concern was to pre- serve uniformity within the industry by forcing Grinnell to agree to the same terms as those found in the NFSA agreement. According to Grinnell, the Union's strategy was to close the deal with NFSA first, and then demand that Grinnell accept the NFSA deal. Indeed, Grinnell argues that the Union was wedded to the agreement it had already signed with NFSA, and therefore could offer only the proposals and terms contained therein. Grinnell believes that this position is indicative of the Union's unwillingness to compromise, and therefore man- dates a finding of impasse.
 
 
 53
 Grinnell's depiction of the Union's position finds no objective basis in the facts determined by the ALJ and the Board. The Union never proposed that Grinnell simply accept the terms of the NFSA agreement. As the Board recognized, "the Union continued to demonstrate its willingness to compromise by giving [Grinnell] proposals which differed from those in the NFSA agreement." Grinnell, 328 N.L.R.B. No. 76 at 2. Furthermore, the Board correctly found Grin- nell's contention undermined by the Union's refusal to accede to a "most favored nation" clause in the NFSA agreement.[13] "By not agreeing to such a clause in the NFSA contract, Preuett would be able to give concessions to [Grinnell] without eroding the employees' terms and conditions of employment with NFSA employers." Grin- nell, 328 N.L.R.B. No 76 at n.4.
 
 
 54
 The record strongly supports the conclusions of the ALJ and the Board that the Union remained open and willing to negotiate on April 12, 1994. The Board, in reaching its determination in this regard, relied on the following: (1) during the final session on April 12, the Union continued to declare its intention to be flexible; (2) when Chatilovicz stated that Grinnell would treat a proposal offered by the Union at that point to be the Union's final offer, Preuett explicitly denied that assertion; (3) Preuett made specific inquiries about "how far apart the parties were" and "in which states [Grinnell] needed movement on wage rates"; (4) after Grinnell rejected the Union's proposal, Chatilovicz told Preuett that he would be in his office until 6:00 p.m., giving Preuett his telephone number if he wanted to talk further; (5) Preuett took Chatilovicz up on this offer, phoning him at 6:00 p.m. to request a meeting the following day; (6) during this conversation, Preuett expressed the Union's continued desire to have Grinnell raise its proposed wage rates;[14] and (7) Preuett suggested that the parties possibly resort to federal mediation.
 
 
 55
 The Board correctly observed that Grinnell's asserting of its "final position" did not, by itself, require a finding of impasse. Grinnell, 328 N.L.R.B. No. 76 at 1 (citing, inter alia, PRC Recording Co., 280 N.L.R.B. 615, 640 (1986), which held that for impasse to occur, both parties must be unwilling to compromise, enforced, 836 F.2d 289 (7th Cir. 1987)). Indeed, the Board reasoned that "it would be both erroneous as a matter of law and unwise as a matter of policy for the Board to find impasse merely because the [Union] is unwilling to capitulate immediately and settle on [Grinnell's] unchanged terms." Grinnell, 328 N.L.R.B. No. 76 at 2. This conclusion is consistent with precedent such as Powell Elec. Mfg. Co., 287 N.L.R.B. 969 (1987), where the Board held that futility, rather than mere frustration, discouragement, or apparent gamesmanship, is necessary to establish impasse. Id. at 973. Put simply, Grinnell's argument of impasse is premised on its own unwillingness -- rather than that of the Union -- to compromise. As the Board stated, "[A]ssuming arguendo that [Grinnell] has demonstrated it was unwilling to compromise any further, we find that it has fallen short of demonstrating that the Union was unwilling to do so." Grinnell, 328 N.L.R.B. No. 76 at 2.[15]
 
 
 56
 Grinnell also argues that, despite Preuett's stated intention, further negotiations would have been futile, since "important issues" remained where no progress had been made. Furthermore, according to Grinnell, the olive branches offered by the Union on the last day of negotiations, i.e., incremental wage improvements, did not demon- strate a genuine willingness to compromise on the crucial issues. The Board has repeatedly held that inconsequential modifications that fail to address the heart of the employer's demands cannot forestall impasse. See Prentice-Hall, Inc., 306 N.L.R.B. 31 (1992); Times- Herald, 223 N.L.R.B. 505 (1976). Accordingly, Grinnell maintains that the Board's characterization of the Union's last offer as a "significant concession" was erroneous.
 
 
 57
 Grinnell, however, inappropriately downplays the importance of the Union's concessions to reach an agreement. As the Board found, these concessions constituted significant progress towards the goal desired by Grinnell -- lower wages for competitive commercial con- tracts. Grinnell, 328 N.L.R.B. No. 76 at 2. On April 12, 1994, the Union made a detailed proposal offering significant discounts varying by states, which Grinnell rejected. Preuett asked Grinnell to identify the states in which the company required a larger discount, but Grin- nell refused to consider this inquiry. Instead, Grinnell declared the existence of impasse, despite the Union's clearly expressed intentions to reach an agreement. Grinnell, 328 N.L.R.B. No. 76 at 2.
 
 
 58
 As the ALJ and the Board both found, Preuett earnestly desired to reach an agreement, believed an agreement could be reached, and continued to explore negotiations and options in pursuit thereof. Any suggestion to the contrary necessarily contemplates that Preuett made his statements of April 12 concerning the Union's desire for an agreement either in bad faith (contemplating the legal ramifications and trying to avoid impasse), or without actual understanding of Grin- nell's position. There is simply no support in the record for either such finding, and we decline to second-guess the ALJ and the Board by divining one.
 
 5. Conclusion
 
 59
 In the context of the record here, and in light of the deferential standard of our review of the Order, we must conclude that the Board's finding that "there was no impasse in bargaining" is sup- ported by substantial evidence.
 
 C.
 
 60
 On April 13, 1994, Grinnell sent a letter to all its employees, informing them of the strike by the Union and their right to remain working. Grinnell's letter explained that all employees had the right to resign their union membership, and even if they did not resign they could remain working. It also informed the employees of Grinnell's intention to hire permanent replacement workers.[16] The Union, in its initial complaint to the Board on April 15, 1994, alleged that Grin- nell's letter threatened the employment status of its employees engaging in the strike, in violation of sections 8(a)(1) and (3). The ALJ agreed and found an unfair labor practice by Grinnell in this connection. The Board then affirmed the ALJ with no discussion.[17] Section 8(c) of the Act protects an employer's right to communicate with its employees, as long as the employer's statements do not contain a "threat of reprisal or force or promise of benefit." Section 8(c)'s protection has been extended to an employer's right to inform employees of its intention to hire permanent replacements in the event of a strike. Eagle Comtronics, Inc., 263 N.L.R.B. 515, 515 (1982).
 
 
 61
 Because the ALJ concluded that the Union's strike was an "unfair labor practice" strike -- in which case the striking employees would have the right to be reinstated -- the ALJ also found that Grinnell's letter threatened the employment status of the strikers by implying that they could be permanently replaced. That is, Grinnell's letter was threatening because it did not specify that Grinnell could hire perma- nent replacements only in the event of an "economic" strike. The ALJ's conclusion was correct, and we will enforce the Board's Order in this regard.[18]
 
 IV.
 
 62
 The Union also petitions for our review of the Order, asserting that Grinnell failed to bargain in good faith from the outset of the negotiation process. According to the Union, Grinnell was not interested in reaching an agreement; rather, it was attempting to"obliterate its longstanding union relationship." Grinnell , 328 N.L.R.B. No. 76 at 13.
 
 
 63
 The Board's finding of good faith bargaining "must be upheld unless the determination has no rational basis in the record." Albritton Communications Co. v. NLRB, 766 F.2d 812, 817 (3d Cir. 1985). In this case, the ALJ found that the evidence failed to establish that Grinnell's bargaining prior to its premature termination of negotiations was in bad faith. This determination by the ALJ was premised on several factors: (1) Grinnell's proposals on wages and benefits were not so unreasonable or harsh as to warrant a finding that they were put forward to frustrate the bargaining process; (2) Grinnell made modifications and concessions during the negotiations; and (3) Grinnell made itself available and accommodated the Union with respect to the timing and location of negotiation sessions.
 
 
 64
 An employer does not violate its duty to bargain in good faith merely by seeking reductions in existing wages and benefits. See, e.g., Brooks, Inc., 251 N.L.R.B. 757, 763 (1980). Nor does Grinnell's decision to pay eight of its nonstriking employees (out of 1100 to 1200 bargaining unit employees) higher wage rates than those set forth in its final offer constitute bad faith. While the ALJ found Grinnell's action in this regard to constitute a separate violation of the Act, Grin- nell, 328 N.L.R.B No. 76 at 23, this finding did not lead either the ALJ or the Board to conclude that Grinnell acted in bad faith. We agree with the Board that, in light of the small number of affected employees, and the instigation of the violative conduct by a district manager disassociated with the negotiations between Grinnell and the Union, the evidence does not mandate a finding of bad faith on the part of Grinnell. See Grinnell, 328 N.L.R.B. No. 76 at 22-23; Litton Systems, Inc., 300 N.L.R.B. 324, 330 (1990), enforced, 949 F.2d 249 (8th Cir. 1991).
 
 
 65
 The Board's finding that Grinnell acted in good faith prior to its premature implementation of its final contract offer is supported by substantial evidence. There is no legal basis for us to disrupt this find- ing, and we decline to do so.
 
 V.
 
 66
 We find no reason to disturb the Board's careful analysis of these complicated labor negotiations, and we conclude that the Order of the Board is supported by substantial evidence. We thus deny Grinnell's petition for review. We grant the Board's cross-application for enforcement of its Order and deny the Union's petition for review.
 
 
 67
 PETITIONS FOR REVIEW DENIED AND CROSS-APPLICATION FOR ENFORCEMENT GRANTED
 
 
 
 Notes:
 
 
 [1]
 The Board decision appealed from is Grinnell Fire Prot. Sys. Co., 328 N.L.R.B. No. 76, 1-7 (May 28, 1999).
 
 
 [2]
 The ALJ's decision can be found at Grinnell, 328 N.L.R.B. No. 76 at 7-25.
 
 
 [3]
 According to Grinnell, the changes embodied in this proposal were designed to address concerns over its declining market share to non- union competition, because overall labor costs under its agreement with the Union were considerably higher than those of non-union operations.
 
 
 [4]
 As explained further in Part III.B.3, infra, the ALJ found that "under the circumstances, the only bargaining sessions that should be considered in determining the impasse question were those in which Preuett represented the Union." Grinnell, 328 N.L.R.B. No. 76 at 13.
 
 
 [5]
 This session occurred one day before the existing agreement between the Union and NFSA was to expire. The Union was negotiating with NFSA on the same date at the same hotel.
 
 
 [6]
 Of importance, on April 8, 1994, the Union and NFSA had reached an agreement. Grinnell was aware of this fact on April 12, 1994, and it knew the details of the agreement.
 
 
 [7]
 Amended complaints were filed on September 29 and December 1, 1995.
 
 
 [8]
 These sections of the Act provide in pertinent part as follows: It shall be an unfair labor practice for an employer-- (1) to interfere with, restrain, or coerce employees in the exercise of the rights [to engage in labor activities] . . .; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization .. .; . . . (5) to refuse to bargain collectively with the representatives of his employees . . . .
 
 
 [9]
 See infra Part IV.
 
 
 [10]
 The ALJ determined that the negotiations that included Preuett were the probative events. Indeed, as noted supra at note 4, the ALJ found that "the only bargaining sessions that should be considered in determining the impasse question were those in which Preuett represented the Union."
 We agree.
 
 
 [11]
 Grinnell's own expert acknowledged that Green's questions were proper.
 
 
 [12]
 That both Grinnell and the Union wanted control of targeting, and that Grinnell saw this as an important issue, does not compel a different conclusion here. The parties agreed on the most important aspect of the targeting program -- the standard to be used in determining which jobs were targeted. Significant progress was made on the rates and benefits that Grinnell would pay for targeted jobs. Furthermore, the targeting pro- gram had been implemented successfully for years prior to the Union's removal of Grinnell's participation. Given this history and that the par- ties were in accord on many of the details of the targeting program, the Board's determination that a compromise on targeting was still possible is amply supported by the evidence.
 
 
 [13]
 A "most favored nation" clause would have obligated the Union to give the NFSA employers any concession that was given to Grinnell. See, e.g., Associated Milk Dealers v. Milk Drivers Union Local 753, 422 F.2d 546 (7th Cir. 1970).
 
 
 [14]
 The parties dispute exactly what was said during this conversation on the evening of April 12, 1994. However, in a crucial credibility finding, the ALJ concluded that "during this conversation, Preuett did not say that he would not lower his proposed wage rates and benefits. Rather, he said that he was not willing to agree to the rates in[Grinnell's] final offer." Grinnell, 328 N.L.R.B. No. 76 at 2 (emphasis in original). We must of course defer to the credibility finding of the ALJ."It is normally not the role of reviewing courts to second-guess a fact-finder's determinations about who appeared more `truthful' or `credible.'" Fieldcrest Cannon, Inc. v. N.L.R.B., 97 F.3d 65, 71 (4th Cir. 1996).
 
 
 [15]
 The dissenting Board Member asserted that the decision of the Board "will allow the parties to create or defeat impasse simply by self- declaration." Grinnell, 328 N.L.R.B. No. 76 at 9. That concern may be valid: just as impasse cannot be declared by fiat, it cannot be avoided simply by a self-serving statement that no impasse exists. Nonetheless, because the standard is an objective one, the possibility of unilateral avoidance is remote. That an evaluation of the objective evidence often encompasses subjective determinations does not increase the risk of caprice. If a party is willing to negotiate to a point that an agreement might be reached, no impasse exists. And we can hardly conceive of bet- ter evidence of a party's willingness to satisfactorily negotiate further than its clear statement to that effect.
 
 
 [16]
 Grinnell's letter to its employees of April 13, 1994, stated in part: We just learned that the Union has called a strike against Grin- nell. Although the Union has the right to strike, Grinnell has the right to run its business. Grinnell must do so in order to meet its commitments to its customers and to keep those customers from going elsewhere. We also have an obligation to those employees who want to work.
 Each of our employees has the right to work and may do so even though a strike has been called. As we told you before, if you are a union member and you choose to work, you may be fined unless you resign your membership. If you resign you may not be fined. Also, if the strike ends, you will have the right to continue working for Grinnell so long as you pay your dues. If some of our employees strike, we will hire permanent replacements to perform our work. Permanent replacements have the right to work even if a strike ends.
 
 
 [17]
 The ALJ found, however, and we agree, that Grinnell's letter did not constitute a "constructive discharge" of striking employees in violation of section 8(a)(3). The Union appeals this ruling, asserting that this case is indistinguishable from Noel Foods Div. of Noel Corp., 315 N.L.R.B. 905, 907-08 (1994), where the Board found constructive discharge when the employer falsely advised employees on the eve of strike that they "would be permanently replaced" at its commencement. The statement was false because insufficient replacements had been obtained to replace all the potential strikers.
 By contrast, Grinnell's letter contained no false statements. Rather, the letter simply informed the employees that they were subject to permanent replacement in the event of a strike.
 
 
 [18]
 The Board also affirmed the ALJ's findings of additional violations that are not contested in this Court. We thus enforce the uncontested aspects of the Order as well. See NLRB v. Cast-a-Stone Products Co., 479 F.2d 396, 398-99 (4th Cir. 1973).
 
 
 
 68
 NIEMEYER, Circuit Judge, concurring in part and dissenting in part:
 
 
 69
 I concur in Part IV of the majority's opinion and dissent from the remainder.
 
 
 70
 On the principal question presented for review in this case -- whether the parties to collective bargaining negotiations reached an impasse thereby entitling the company to implement its final contract offer made to the union -- the majority opinion collapses the issues in negotiation without focusing on the two issues which were essential to agreement and on which no progress was made during negotiations. For legitimate business reasons, the company in this case determined (1) that it had to control the targeting of authorized wage reductions to meet nonunion competition without any union veto and (2) that the targeting had to be authorized by the collective bargaining agreement at a fixed, uniform rate. When the eye is kept on these issues during the negotiations, the conclusion follows, by a straight- forward application of governing law, that an impasse was reached in this case. I would for that reason grant the company's petition for review and deny the union's cross-petition for review.
 
 
 71
 * Grinnell Fire Protection Systems Company ("Grinnell"), a subsidiary of Tyco International Ltd. ("Tyco"), designs, manufactures, and installs fire sprinkler systems throughout the United States and is the largest such business in the country. Grinnell's employees have been represented by several locals of the United Association of Journey- men and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("the International Union"), and the largest of these is Local 669 (sometimes "the Union"), which represents approximately 1,200 Grinnell employees in 47 states. Until September 1993, Grinnell was represented in collective bargaining negotiations by the National Fire Sprinkler Association ("NFSA"), a multi- employer trade association consisting of about 150 companies. The last contract negotiated for Grinnell by the NFSA was effective from April 1, 1991, through March 31, 1994.
 
 
 72
 In September 1993, more than six months before the expiration of its contract with the Union, Grinnell gave the Union written notice by letter that it was revoking the NFSA's authority to bargain on its behalf and wished to negotiate independently with the Union for a new contract. During the 1990s, Grinnell became concerned about its profits and declining market share and believed that NFSA was either "unwilling or unable" to do what was necessary to control costs and keep unionized contractors competitive. Indeed, to stem the loss of business to nonunion contractors, Local 669 had instituted a job "targeting" program which allowed Grinnell, as well as other signatories to the NFSA agreement, to negotiate concessionary wage rates with the Union on a project-by-project basis to meet nonunion competition. Under the program, however, the Union retained discretionary control over the decision to grant or deny an employer's request to target a particular project with a concessionary wage rate. Grinnell had been the principal user of the targeting program until May 1993, when the Union added the requirement that a company wishing to participate in the targeting program had to commit to be bound by the next NFSA multi-employer collective bargaining agreement. When Grin- nell refused to agree to this condition, the Union denied the company participation in the targeting program. In July 1993, after Local 669 elected a new business manager, that manager reinstated Grinnell as a participant in the targeting program, but the Union again excluded Grinnell from the program after Grinnell withdrew from the NFSA authority to negotiate a collective bargaining agreement on Grinnell's behalf.
 
 
 73
 In its September 22 letter to the Union, Grinnell expressed its wish to begin negotiations "immediately to reach an agreement that is competitive and provides in the future for full employment for our Company's employees and your union members." Less than two months later, on November 12, 1993, Grinnell's representatives met informally with the Union and outlined the contours of Grinnell's bargaining position in preparation for formal contract negotiations. Grinnell described a need to make changes to remain competitive in the face of changing local market conditions. It indicated that it would seek, among other things, to pay wages competitive with the local markets in which the company operated, to employ on certain projects a higher ratio of unskilled workers to skilled journeymen, to pay lower contributions to the health and welfare plan, and to freeze the current pension plan and institute a 401(k) plan. Grinnell and the Union agreed to begin formal negotiations at a meeting they scheduled for January 18, 1994.
 
 
 74
 Before the next meeting, however, controversy developed within Local 669, leading its president and secretary-treasurer to ask the International Union to place the local in trusteeship. The International Union appointed Tommy Preuett to serve as trustee of Local 669. Because of these internal difficulties, the Union canceled the scheduled January negotiating session with Grinnell. Grinnell, which had become aware of the Union's internal problems, sent a written proposal to the Union in lieu of attempting at that time to schedule a bar- gaining session. This "1st Proposal for a New Collective Bargaining Agreement" was accompanied by a letter in which Grinnell stated:
 
 
 75
 Although the unionized companies in our industry have had some good years, it is clear that we are headed for a steep decline if we don't make some changes now. The figures throughout the U.S. show that we are losing market share to our non-union competition. This is because our overall labor costs under the Local 669 contract are so much higher than what our competition is paying. Wages in some locations, health care costs and our inability to effectively use appren- tices and helpers present major problems for Grinnell.
 
 
 76
 The proposal included a provision that would give Grinnell control over the wage rate, within a specified range, to pay journeymen in each state to meet nonunion competition. Grinnell's choice of wage rates from within the specified range would be "a function of the local economic conditions." This proposal differed most significantly from the previous "targeting" program that the Union had instituted by giv- ing Grinnell, instead of the Union, the discretion to target projects with lower wage rates. Grinnell also proposed to create a new job cat- egory of unskilled "helpers," who would be paid "as determined by Grinnell," and the ratio of skilled fitters to unskilled workers could change from 2:1 to 1:1. Finally, in the area of pension and health ben- efits, Grinnell proposed to replace the existing National Automatic Sprinkler Industry ("NASI") health and pension plans with Tyco's health and 401(k) plans.
 
 
 77
 Three days after Grinnell sent the Union its first contract proposal, Grinnell's lawyer and chief negotiator, Peter Chatilovicz, and Grin- nell's president, Jerry Boggess, met with the Union's lawyer, William Osborne, to discuss Grinnell's first proposal informally. Chatilovicz explained to Osborne that Grinnell was seeking "institutionalize[d] targeting," which would allow Grinnell discretion unilaterally to reduce Union fitters' wage rates to a "targeting rate" for projects on which the company faced nonunion competition. The wage-rate range within which Grinnell would be able to set a targeting rate would be specific to each state, and as set out in Grinnell's proposal, would have a floor fixed at 65% of the standard journeyman wage rate in each state.
 
 
 78
 Following these various informal meetings between Grinnell and the Union and Grinnell's submission of its first proposal, which defined the main issues for negotiation, the parties conducted six for- mal negotiating sessions before Grinnell declared that the parties were at an impasse.
 
 
 79
 First formal negotiating session -- March 17, 1994. As this was the first session, Grinnell's president, Boggess, explained to the Union's business manager, John Lundak, as well as Osborne and two other Union representatives, his views concerning the future of the industry, and Chatilovicz explained Grinnell's reasons for withdraw- ing bargaining authority from the NFSA. Chatilovicz said that, in bar- gaining independently with Local 669, Grinnell was seeking an agreement that would resolve the key competition issues that it faced. He then presented Grinnell's second proposal for agreement, which, in the area of targeting, provided for a fixed maximum wage-rate reduction to be implemented by Grinnell, in its discretion, for any project on which Grinnell faced nonunion competition. The fixed tar- geting rate would be no lower than 65% of the journeyman wage rate in each state. In explaining the key elements of the proposal, Cha- tilovicz stated that Grinnell "wanted control of targeting." The parties did not engage in any significant negotiations concerning wages or health and pension benefits, but they did agree to a three-year term for the next contract and discussed other issues such as inspection and subcontracting. The Union indicated that it needed time to study the proposals before discussing them further.
 
 
 80
 Second formal negotiation session -- March 18, 1994: The parties again discussed Grinnell's targeting proposal, which Grinnell then modified, increasing the minimum targeting rate from 65% to 75% of the journeyman wage rate. In response to a Union query, Grinnell indicated that, under its proposal, targeting decisions would not be subject to grievance procedures and would rest within the sole discre- tion of the company. But the company did allow that a Union- employer committee might be set up to review any allegations that Grinnell misused its targeting authority on particular projects. Grin- nell asked for a response to its targeting proposal, and the Union responded that it did not yet have a full response. Before concluding the session, however, the Union presented a wage proposal calling for yearly increases in the hourly journeyman rate and an increase in the wage differential for foremen.
 
 
 81
 Third formal negotiating session -- March 30, 1994. Before this session, the Union had rejected Grinnell's request for a five-day renewable contract extension and had sent Grinnell a strike notice. In response, Grinnell had stated that in the event of a strike, it would hire permanent replacement workers. Also before this third session, the International Union had designated Preuett as trustee of Local 669, and he now appeared on behalf of the Union at this session. Because Preuett was a newcomer, Chatilovicz again outlined Grinnell's rea- sons for withdrawing bargaining authority from the NFSA and the issues that were important to Grinnell, namely, the fixed minimum targeting wage rate institutionalized in the agreement at 75% of the regular journeyman rate, the 1:1 ratio of journeymen to unskilled workers, and the changes in the health and pension plans that Grinnell had proposed. Chatilovicz also expressed his concern that Preuett would reach an agreement with the NFSA that did not address Grin- nell's concerns and then would expect Grinnell to accept a similar agreement. Preuett indicated that he was at that time and in the same hotel conducting negotiations with the NFSA and that he would explore whether, based on Grinnell's larger size, the Union could offer Grinnell some things it did not offer the NFSA contractors. On the issue of targeting, Preuett indicated that he was opposed to a uni- form targeting rate because nonunion contractors could learn the rate and bid under it. When Preuett expressed concerns about the Tyco health plan, Chatilovicz responded that Grinnell was"not wedded" to it. Preuett said he had no problem with the change in the ratio of jour- neymen to apprenticemen. As they closed this session, Preuett asked for a 30-day extension of the existing contract, but Grinnell responded that it did not want negotiations to drag out for weeks and refused the request.
 
 
 82
 Fourth formal negotiating session -- April 7, 1994 . The Union presented Grinnell with its first complete contract proposal. This pro- posal included the same wage increases that the Union had proposed at the third session and included a targeting proposal that did not grant Grinnell control over wage-rate targeting. Rather, the proposal pro- vided that representatives of the parties would agree to a targeting wage rate, but not until after the new contract went into effect, and that Grinnell would not be guaranteed any particular rates. The Union's proposal also called for Grinnell to continue its contributions to the NASI health and pension plans. Grinnell responded to the Union proposal, continuing to insist that any agreement include a fixed minimum targeting wage rate of 75% of the standard journey- man rate. It also proposed either the Tyco health and 401(k) plans or reduced contributions by Grinnell to the NASI plans. The parties con- tinued to negotiate and discuss wage regimes and adjustments. While Grinnell insisted on a minimum targeting wage rate of 75% of the journeyman rate for the first year of the contract, it allowed for the possibility of rate adjustments after the first year. Grinnell, however, continued steadfastly to insist that any agreement confer on the com- pany discretion to target wages at a fixed, uniform rate. The parties went back and forth with the proposals concerning employer contri- butions to the health, welfare, and pension plans: Preuett proposed successively lower employer contributions, and Grinnell proposed either the Tyco health plans or the NASI plans with further reductions in contributions. At the end of the session, Grinnell prepared a chart listing the issues the parties had yet to resolve.
 
 
 83
 Fifth formal negotiating session -- April 8, 1994. The parties again discussed targeting, and Preuett proposed a regime under which Grin- nell could lower wage rates on certain types of projects -- commer- cial and residential. Chatilovicz insisted on an across-the-board targeting rate at a fixed 75% of the journeyman in wage rate, to be triggered unilaterally by Grinnell when it faced nonunion competition on a particular project. Chatilovicz explained to the Union, as recorded in notes taken at the session, "The hard news is that we are not giving [the] union control of this. We are not walking away from [the] table with [the] union in control." Chatilovicz stated that the company's proposal was its "final proposal" on the targeting issue. Preuett indicated that the Union was "open on . .. economics," but that it "want[ed] flexibility" and "need[ed] some control of its destiny on targeting. The union sets the standard." The parties also discussed other issues. Preuett said that his primary goal was that health and pension benefits be portable and uniform, if possible, among Grinnell and the other NFSA employers. Preuett asked about Tyco's 401(k) plan and indicated he wanted to research it further. The parties agreed to meet again on April 12, 1994, and Chatilovicz asked Preuett for specific responses to Grinnell's proposals concerning (1) health and pension benefits and (2) uniform, fixed minimum wage-rate targeting at the discretion of Grinnell for all projects with nonunion bidders.
 
 
 84
 Sixth formal negotiating session -- April 12, 1994. By this meeting the Union had reached agreement with the NFSA (on April 8), and Grinnell had become aware of the details of the agreement. Following exchanges on the issue of inspections and Chatilovicz's charge that Preuett was "playing games," Chatilovicz suggested that the parties employ a federal mediator to resolve the remaining issues. Preuett protested that he was not playing games, that he wanted uniformity in the industry, and that he had made proposals to accomplish this as well as concessions on several issues. Chatilovicz asked Preuett for the Union's best proposal, expressing his understanding that Preuett was interested in uniformity and might not be able to offer Grinnell an agreement with terms different from the agreement that the Union had reached with the NFSA. Preuett brought a benefits expert to the meeting to discuss the Tyco plans and indicated that he was not pre- pared to discuss the plans until the expert had studied them further. On wages, Preuett stated that he wanted a wage-rate freeze with no fixed-percentage targeting reductions, again referring to the Union's proposal, which had been incorporated in the NFSA agreement and under which commercial and residential wage rates would be lower than the standard industrial rates. After a lunch break, Chatilovicz presented Grinnell's "final proposal" on open issues. This proposal included a targeting rate fixed at 80% of the journeyman rate for any project with competing nonunion bidders; the Tyco health plan with no standard employee contribution for the first year; the Tyco 401(k) plan with a service credit; and rejection of the Union's proposal for contributions by Grinnell to the supplemental pension fund. The Union made a counterproposal, resubmitting its previous benefits pro- posals and offering reductions in wage rates for commercial projects amounting to $1.00 in 30 states and $1.50 in 17 states. Preuett later conceded that the wage rates offered to Grinnell were "close" to those incorporated in the NFSA agreement, and Chatilovicz testified that the difference between the proposal and the terms of the NFSA agree- ment amounted to $.50 in three states. Chatilovicz indicated that he would consider the Union's last offer to be its final proposal and rejected it, saying that Grinnell was not interested in the NFSA agree- ment. He indicated that he would be in his office until that evening in case Preuett changed his mind. Preuett said that he had not yet made the Union's final offer and that Chatilovicz was trying to push him into impasse but that he would not give up easily. The parties dis- cussed the difference between Grinnell's targeting wage-rate proposal and the Union's wage-rate proposal in some of the states and then broke off the meeting.
 
 
 85
 Following the sixth formal negotiating session, during the evening of the same day -- April 12 -- Preuett called Chatilovicz and asked to meet again the following day. Chatilovicz inquired what the Union planned to propose, and Preuett responded that he hoped to get Grin- nell to raise its proposed wage rates. Chatilovicz said that Grinnell's proposal was its final offer and that it would not alter its proposed wage rates or benefit plans. When Preuett suggested that the parties bring in a federal mediator, Chatilovicz asked if Local 669 was will- ing to come down to Grinnell's wage rates. Preuett responded that the Union would not agree to Grinnell's wage rates, and Chatilovicz said that, in that case, a mediator would not help them reach agreement. Chatilovicz stated that Grinnell's position was carved in stone, to which Preuett responded that he hoped Grinnell would change its position and negotiations would resume later.
 
 
 86
 Later that same evening, Preuett called a nationwide strike against Grinnell, and on the following day, Grinnell declared that the parties had reached an impasse and that Grinnell was therefore implementing its final contract offer. Grinnell sent a letter to its employees dated April 13, 1994, explaining the impasse, announcing the implementa- tion of its last proposal, and indicating that it would hire permanent replacements for striking employees.
 
 
 87
 The next day, on April 14, 1994, Local 669 and the International Union filed unfair-labor-practice charges against Grinnell, alleging, among other things, that Grinnell failed to bargain in good faith, unlawfully unilaterally instituted its final offer before the parties reached a good-faith impasse in their negotiations, and unlawfully discharged Union members in its April 13 letter. Based on these charges, the Regional Director of the National Labor Relations Board ("Board") issued a complaint alleging that Grinnell had committed violations of § 8(a)(1), (3), and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (3), (5).
 
 
 88
 Following a 22-day hearing, the Administrative Law Judge ("ALJ") concluded that Grinnell had bargained in good faith before declaring an impasse but that the parties had not reached a good-faith impasse in their negotiations. Accordingly, the ALJ found that Grinnell vio- lated § 8(a)(5) of the NLRA by implementing its final offer and that the Union strike was an unfair-labor-practice strike. The ALJ also found that Grinnell violated § 8(a)(1) of the NLRA by implying to the striking workers in the April 13 letter that they could be permanently replaced, but he recommended the dismissal of the allegation that the company had in that letter unlawfully discharged the striking employ- ees. The ALJ recommended the entry of an order that Grinnell cease and desist from its unlawful conduct and take specified affirmative action to remedy it.
 
 
 89
 By a 2-1 vote, the Board adopted the ALJ's finding that the parties had not reached an impasse on April 12, 1994. See Grinnell Fire Pro- tection Sys. Co., 328 N.L.R.B. No. 76, at 1 (May 28, 1999). As a result, the Board found that Grinnell committed unfair labor practices when it refused to bargain further with the Union, when it unilaterally changed the terms and conditions of employment by implementing its final contract offer, and when it indicated it would hire permanent replacements for the striking workers. The Board also adopted the ALJ's findings that Grinnell had bargained in good faith and did not effectively discharge its employees in its April 13 letter, which informed them of its plan to implement its final offer because negotia- tions were at an impasse. Finally, the Board found additional unfair labor practices, which Grinnell has not contested before this court.
 
 
 90
 The Board's decision on the impasse issue relied on Preuett's numerous representations that the Union had not yet given Grinnell its final offer and remained flexible. The Board pointed to Preuett's "continued willingness to bargain by raising the possibility of Federal mediation" during his evening phone call to Chatilovicz on April 12, 1994. Id. at 2. The Board also drew support from its precedent in which no impasse had been found, despite the fact that one party at the bargaining table had asserted that it had reached its final position and the other had not yet offered specific concessions. See, e.g., Rich- mond Recording Corp., 280 N.L.R.B. 615, 640 (1986), enforced, 836 F.2d 289 (7th Cir. 1987).
 
 
 91
 The dissenting Board member concluded that the majority had "misapplied the law concerning bargaining impasse in a most deleteri- ous way." Grinnell Fire Protection, 328 N.L.R.B. No. 76, at 4 (Hurt-gen, dissenting). This member pointed out that "[t]he Union was unwilling to give [Grinnell] the unilateral right to lower wages on a particular job. In addition, the Union wanted uniformity among employers." Id. at 6. He also observed that the targeting control issue was not only a key issue for both sides but also"a matter of princi- ple," on which "neither party was willing to yield." Id.
 
 
 92
 From the Board's decision, Grinnell petitioned for review, chal- lenging the Board's finding that an impasse had not been reached.
 
 
 93
 The issues on which I disagree with the majority are (1) whether Grinnell prematurely declared an impasse; and (2) whether Grinnell committed an unfair labor practice by sending its April 13 letter to striking employees informing them that the negotiations had reached an impasse, that it intended to implement its final contract offer, and that it would hire permanent replacements for striking employees. I address these in turn.
 
 II
 
 94
 Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The obligation to bargain collectively imposes a duty on an employer to meet with the represen- tatives of his employees at reasonable times and"confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). The obligation, however, "does not compel either party to agree to a proposal or require the making of a concession." Id.; see also NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 402 (1952) ("The Act does not compel any agreement what- soever between employees and employers").
 
 
 95
 An employer's duty to bargain in good faith obliges it "to honor the terms and conditions of an expired collective bargaining agreement pending negotiations on a new agreement." Laborers Health & Wel- fare Trust Fund v. Advanced Lightweight Concrete Co. , 484 U.S. 539, 544 n.6 (1988) (citing NLRB v. Katz, 369 U.S. 736, 743 (1962)); see also Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 199 (1991) (referring to this duty as the "unilateral change doctrine"). If parties reach an impasse in their negotiations, however,"the employer's stat- utory duty to maintain the status quo during post-contract negotiations . . . end[s]." Laborers Health & Welfare Trust Fund, 484 U.S. at 543 n.5 (citing American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318 (1965)). An impasse occurs, and an employer's duty to negotiate is satisfied, "when the parties in good faith reach a point in their discus- sions where further meetings and discussions objectively appear to be futile." AMF Bowling Co. v. NLRB, 63 F.3d 1293, 1301 (4th Cir. 1995).
 
 
 96
 On the issue of impasse in this case, we are not presented with dif- fering factual accounts material to the question of whether an impasse occurred. Of course, when the record contains differing factual accounts, we are bound to defer to the Board's findings of fact. See 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); AMF Bowling Co., 63 F.3d at 1301. But here, we have a set of historical circumstances that are essentially uncontroverted by the parties. One side, emphasizing particular facts, contends that an impasse was properly declared; the other side emphasizing other facts, contends that an impasse was not properly declared. The resolu- tion of this issue -- which amounts essentially to a determination of what facts are necessary to establish the existence of impasse -- is a matter of law, on which we sustain the Board's determination only if it is reasonable and consistent with the NLRA. See NLRB v. Yeshiva Univ., 444 U.S. 672, 691 (1980); NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1269 (4th Cir. 1994).
 
 
 97
 On the record before us, Grinnell points to facts that, it argues, demonstrate the futility of further negotiations with the Union, based on (1) the history of the parties' negotiations, (2) Grinnell's good- faith bargaining before declaring the impasse, (3) the lack of move- ment by either party on issues key to Grinnell, and (4) the indications that the Union was unwilling to offer concessions to Grinnell signifi- cantly different from those to which it had committed in its new con- tract with the NFSA. Grinnell disputes the Board's conclusion that the incremental wage concessions offered by the Union on April 12, 1994, demonstrated flexibility in the Union's bargaining position. Grinnell points out first that it did not ask for such concessions, and second that such concessions only highlight the correctness of its belief that it could expect no movement from the Union on its demand for company-controlled targeting at a uniform, fixed rate. Grinnell argues that the Union's conduct, and the predicament it faced in bar- gaining with Grinnell and the NFSA separately, forecast to the company that the parties would remain unable to reach agreement on the key issues, despite the Union's declaration of flexibility.
 
 
 98
 The Union disputes Grinnell's assertion that the company could reasonably have believed that the Union was unwilling to offer significant concessions beyond those contained in the NFSA agreement. The Union points to the uncontroverted facts that it never offered the NFSA contract to Grinnell; that it in fact offered better wage terms to Grinnell than to the NFSA; and that it refused to grant the NFSA a "most-favored-nation" clause in its contract. The Union also argues that any delay in conducting negotiations and in the Union's presenta- tion of counterproposals was attributable to the internal turmoil within Local 669 and that these circumstances heightened the need for fur- ther negotiations before declaring an impasse. The Union additionally points out that the parties had made progress in their negotiations before Grinnell declared an impasse. As of April 12, 1994, the parties had resolved the majority of issues in contention and had made progress on the remaining open issues. As evidence of progress in the area of wages, the Union highlights its offer of wage concessions and its offer to "lock in" the targeting rate on an annual basis. Further, it points out that Grinnell's position on targeting proved to be flexible, as evidenced by changes in its proposals for a minimum targeting wage rate, from 65% to 75%, and then to 80%, of the journeyman wage rate. Finally, the Union argues that the parties' disagreement over whether Grinnell would have contractually conferred discretion to target wages at a uniform, fixed rate was not a disagreement of fundamental principle but rather one of "simply dollars and cents," on which movement by both sides had occurred up until the final day of negotiations.
 
 
 99
 Resolution of this case turns on whether an impasse can be based on a single issue or two and whether the objectively established facts justified Grinnell's declaration of an impasse in this case. Even though the determination of whether an impasse was properly declared is an objective one, we nevertheless take the circumstances "from the vantage point of the parties at the time they believed an impasse was reached." AMF Bowling, 63 F.3d at 1301.
 
 
 100
 In the negotiation of a collective bargaining agreement, during which many substantial areas important to a contract between a com- pany and a union must be resolved, movement toward agreement -- or even full agreement -- on most of the issues does not necessarily forecast that an agreement can be reached if there is no movement by the parties in an area of great importance to one side. Stated other- wise, if in good faith one party insists on an important point that it reasonably believes is essential to the overall agreement and the other party indicates an unwillingness to compromise on that point, then movement or agreement on other points essential to the agreement and one party's expressions of a willingness to keep trying will not prevent an impasse. See AMF Bowling, 63 F.3d at 1301-02.
 
 
 101
 In this case, it was important -- indeed essential-- to Grinnell that it control the targeting of wages to meet nonunion competition with- out any Union veto and that the targeting be authorized by the collective bargaining agreement at a fixed, uniform rate. The record reveals without any doubt that this issue was of paramount importance to Grinnell from the beginning. Indeed, it was a driving factor in Grinnell's break from the NFSA for bargaining purposes. While there was movement and flexibility from the Union in most other areas of nego- tiation, on this point the Union never exhibited any flexibility or presented any counterproposal that did not include a Union veto over targeting decisions. If the position adopted and insisted upon by Grinnell was important and maintained in good faith, then we must conclude that based on the circumstances an impasse was reached, because regardless of whether agreement could be reached on all other issues, if this one point could not be resolved, no overall agreement could be anticipated. Because the Union has not denied that Grinnell's position was important to it and maintained in good faith, I readily conclude that Grinnell was entitled in the circumstances to declare impasse because there was no prospect of movement on the important point of targeting. I reach this conclusion from the follow- ing six factors contained in the record:
 
 
 102
 First, the context of the negotiations served to identify early on the issues and their importance. The basic reason why Grinnell broke from the NFSA to negotiate its own collective bargaining agreement with the Union was to obtain targeting control so as to have the ability to meet competition. Grinnell recognized that it was losing market share to nonunion competition and believed that it was headed for a steep decline if it could not change its basic method of conducting business. For that reason, some six months before the March 1994 end of the collective bargaining agreement, Grinnell notified the national trade association of which it was a member that it was with- drawing for collective bargaining purposes, and it likewise notified the Union of its decision, explaining why. This backdrop confirms objectively the legitimacy and importance of positions later taken by Grinnell during negotiations with the Union.
 
 
 103
 Second, and most important, throughout the negotiations with the Union, Grinnell bargained in good faith, a fact found by the Board. As we noted in AMF Bowling, 63 F.3d at 1299, it "[b]ear[s] significantly on our analysis" that Grinnell bargained in good faith up to the point at which it declared the parties were hopelessly deadlocked. This finding is significant because only a genuine impasse, not a deadlock caused by the failure of an employer to bargain in good faith, permits the employer to take unilateral action on issues that are the mandatory subject of collective bargaining under the NLRA. See id.; see also Newspaper Printing Corp. v. NLRB, 625 F.2d 956, 966 (10th Cir. 1980); United Fire Proof Warehouse Co. v. NLRB, 356 F.2d 494, 497 (7th Cir. 1966). The Board's finding of good faith additionally serves as a "powerful fact" in favor of Grinnell because it permits an inference that Grinnell "made a bona fide offer to reach agreement[,] . . . that it was honest in its negotiating positions, and that it did not act out of any motive contrary to its stated desire to negotiate a new contract." AMF Bowling, 63 F.3d at 1299.
 
 
 104
 Third, my conclusion that Grinnell's declaration of impasse was justified is supported by the length of the bargaining history, which included several informal meetings and communications and six for- mal negotiating sessions. Despite this bargaining history, neither party was able to persuade the other to move from its position on the issue of whether Grinnell would control targeting and whether targeting would be authorized in the collective bargaining agreement at a fixed, uniform rate. The lack of significant movement on a central issue through the many negotiating sessions and informal meetings tends to demonstrate that parties are deadlocked on the issue. See Taft Broad. Co., 163 N.L.R.B. 475, 478 (1967) (listing "the length of the negotia- tions" as a relevant factor in the inquiry into whether parties reached a bargaining impasse). The Union argues that the number of sessions was insufficient to demonstrate an impasse due to the controversy within the Union that resulted in the replacement of its chief negotiator after the second formal negotiating session. But this fact is not significant to whether Grinnell reasonably concluded that the parties were deadlocked on the targeting issue because the substance of the Union's negotiating position on the targeting issue did not change with the imposition of the trusteeship in March 1994 and the change of Union leadership.
 
 
 105
 Fourth, neither party showed movement throughout the negotiations on the essential aspects of the targeting issue -- whether Grin- nell would enjoy contractual authority unilaterally to implement targeting through a nationwide, fixed targeting rate. While the Board and the Union both rely on wage-rate movement by the parties through the last formal negotiating session as evidence that further negotiations could have led to agreement on the wage issues, this reliance is misplaced because it fails to take into account the parties' strikingly divergent positions on targeting. While the Union perhaps believed that it could convert the targeting issue to a wage issue, this fails to account for Grinnell's position that control over targeting was both basic and essential -- an issue of "extreme importance" to Grin- nell. A recounting of the record reveals this.
 
 
 106
 According to the parties' practice from November 1991 until May 1993, Grinnell would request targeting on a project-by-project basis from the Union, which had the final say both on whether targeting would occur and on the targeting wage rate. Grinnell was excluded from this program when it refused to agree to negotiate its next con- tract through the NFSA. In January 1994, in its first contract proposal and in a subsequent informal meeting, Grinnell conveyed to the Union its desire to have control of targeting because it was losing business to nonunion competitors. Throughout the negotiations, Grin- nell did not waiver from this position. Grinnell also consistently insisted on a uniform, contractually fixed targeting rate while exhibiting flexibility on the rate amount, moving from 65% to 75%, and finally to 80%, of the standard journeyman wage rate.
 
 
 107
 In response to Grinnell's request for control over targeting and for a nationwide, fixed targeting rate, the Union never offered a counter- proposal. At the first formal negotiating session on March 17, 1994, it requested time to study the issue. At the second session, the Union offered a wage proposal calling for yearly increases in journeymen's wages and an increase in the wage differential for foremen, but it offered no provision for wage targeting. At the third session, the Union again made no counterproposal. When Chatilovicz informed Preuett that Grinnell considered targeting control, institutionalized in the agreement at a fixed rate of the regular journeyman rate, to be one of the important issues at stake in the negotiations, Preuett responded that he was opposed to a uniform targeting rate because nonunion contractors would be aware of the rate and could undercut it. At the fourth session, the Union proposed the same wage increases it had proposed at the second meeting and added a targeting proposal under which, after the parties formed a new collective bargaining agreement, Grinnell and Union representatives in each district would set targeting wage rates for that district to become effective for the fol- lowing year. But this agreement was essentially the status quo ante; it did not give Grinnell unilateral control over targeting and Grinnell would not be guaranteed a fixed, uniform targeting rate for the duration of the collective bargaining agreement. At the fifth negotiating session, while Grinnell continued to insist on a fixed, across-the- board targeting rate, the Union discussed its proposal to lower wage rates on commercial and residential, as distinct from industrial, projects. Finally, at the sixth session, the Union proposed a wage-rate freeze with no fixed targeting wage-rate reduction. While Grinnell changed its proposed fixed targeting rate again, from 75% to 80%, it continued to reject any arrangement under which the Union would be able to withhold targeting. Throughout the negotiations, the Union showed a determination to focus on wage rates and deny Grinnell the contractual authority to unilaterally implement a fixed, uniform targeting wage reduction. The lack of movement by either side during the six sessions on this targeting issue is an objective factor supporting Grinnell's conclusion that the parties were unlikely to reach agreement on that essential issue.
 
 
 108
 Fifth, the question of whether Grinnell would enjoy contractual discretion to target wages with a fixed, uniform percentage reduction was consistently highlighted by the company as an issue of great importance. See Taft Broad. Co., 163 N.L.R.B. at 478 (identifying "the importance of the issue or issues as to which there is disagreement" as a factor relevant to the consideration of whether bargaining impasse existed). Grinnell's emphasis of the issue during negotiations, coupled with the lack of movement over six formal negotiating sessions, persuasively demonstrates that the parties were unlikely to reach agreement and that further negotiations would be futile. See AMF Bowling, 63 F.3d at 1301-02.
 
 
 109
 Sixth, the contextual facts available to Grinnell at the time it declared an impasse in the negotiations reasonably forecast to the company that the Union was unwilling to make a proposal that differed significantly from the agreement it had formed with the NFSA. See AMF Bowling, 63 F.3d at 1299 ("If the party declaring an impasse does so in good faith and its conclusion is justified by objectively established facts, then the duty to bargain is satisfied"); Taft Broad. Co., 163 N.L.R.B. at 478 (identifying "the contemporaneous under- standing of the parties as to the state of negotiations" as a factor relevant to the consideration of whether bargaining impasse existed). Because the NFSA contract did not confer control over targeting on employers and did not establish uniform or fixed wage rates to apply when an employer faced nonunion competition on a project, a conclusion reasonably available to Grinnell was that the Union would not agree to such terms in its contract with Grinnell. On several occasions, Preuett, on behalf of the Union, emphasized to Grinnell's representatives the importance of uniformity within the industry. The concessions that the Union made in the area of wages did not significantly differ from concessions the Union made to the NFSA. The Union proposed to Grinnell the same wage structure to which it and the NFSA agreed, with wage concessions on commercial projects of $1.00 in 30 states and $1.50 in 17 states. The most the Union departed from the terms it offered to the NFSA in its contract negotiations with Grinnell, according to Chatilovicz, amounted to the additional wage concession of $.50 in three states, and Preuett conceded that the wage rates offered to Grinnell were "close" to those in the NFSA agreement. Preuett's adherence to the terms of the NFSA agreement when making contract proposals to Grinnell, coupled with the Union's repeated statements that it was most interested in industry uniformity, provided additional objective evidence from which Grinnell could forecast that further negotiations on the targeting issue would be futile.*
 
 
 110
 In short, I conclude that the deadlock on an important issue essential to Grinnell's assent to an agreement justified its declaration of an impasse on the entire agreement despite the fact that there was movement on other issues on which agreement could reasonably have been anticipated.
 
 III
 
 111
 Against the background that the strike was begun over economic issues after an impasse was reached, I next consider the issue of the April 13, 1994 letter's legality. On the day after the Union called its nationwide strike against Grinnell, Grinnell wrote its April 13 letter of explanation to its employees, a letter that the Board found violated § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), because, contrary to Grinnell's belief, the Board considered the strike to be an unfair- labor-practice strike, rather than an economic strike. It concluded that Grinnell's statement in the letter that it would hire permanent replacements unlawfully threatened employees because, in an unfair-labor- practice strike, striking employees cannot be permanently replaced. Grinnell petitions for review of this ruling, arguing principally that the strike was not an unfair-labor-practice strike but an economic one and that its statement about hiring permanent replacements was an accurate statement of the law.
 
 
 112
 The Union also seeks review of the Board's findings with respect to the April 13 letter because the Board rejected its arguments that the letter effectively terminated striking employees in violation of § 8(a)(1) and (a)(3) of the NLRA, 29 U.S.C.§ 158(a)(1), (3). The Board adopted the ALJ's conclusion that the letter did not effectively terminate striking employees because "there was no mention of a deadline and nothing to indicate that replacements had already been hired or that the process of hiring replacements had begun." Cf. Noel Food Div., 315 N.L.R.B. 905, 907-08 (1994), enforcement denied in relevant part, 82 F.3d 1113 (D.C. Cir. 1996); American Linen Supply Co., 297 N.L.R.B. 137, 137 (1989), enforced , 945 F.2d 1428 (8th Cir. 1991). The Union now argues that the letter "constructively" dis- charged striking employees.
 
 
 113
 The letter, dated April 13, 1994, which was sent to all of Grinnell's employees, states in pertinent part:
 
 
 114
 Over the past month, we have tried to keep you informed about our negotiations with Local 669. Although we met with the Union on April 7, 8, and 12, the parties were unable to reach an agreement and are now at impasse.
 
 
 115
 * * * * * *
 
 
 116
 Because we have reached impasse in our negotiations and feel so strongly about the changes we have proposed, we are putting into effect the terms of our final offer, effective Thursday, April 14, 1994.
 
 
 117
 * * * * * *
 
 
 118
 We just learned that the Union has called a strike against Grinnell. Although the Union has the right to strike, Grin- nell has the right to run its business. Grinnell must do so in order to meet its commitments to its customers and to keep these customers from going elsewhere. We also have an obligation to those employees who want to work.
 
 
 119
 Each of our employees has the right to work and may do so even though a strike has been called.
 
 
 120
 * * * * * * If some of our employees strike, we will hire permanent replacements to perform our work. Permanent replacements have the right to work even if a strike ends.
 
 
 121
 (Emphasis added).
 
 
 122
 Because I would have concluded that the parties did reach an impasse and that the strike was an economic one, I would reverse the findings of unfair labor practices stemming from the Board's conclusions that the parties were not at an impasse, including the Board's finding that the April 13 letter violated § 8(a)(1) of the NLRA. I would also reject the Union's position that the letter constructively discharged the employees in violation of § 8(a)(3). See 29 U.S.C. § 158(a)(3) (prohibiting "discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization").
 
 
 123
 We have recognized constructive discharge in violation of § 8(a)(3) of the NLRA "[w]here an employer deliberately makes an employee's working conditions intolerable and therefore forces him to quit his job because of union activities or union membership." NLRB v. CWI of Maryland, Inc., 127 F.3d 319, 328 (4th Cir. 1997) (quoting J. P. Ste- ven & Co. v. NLRB, 461 F.2d 490, 494 (4th Cir. 1972)). Accordingly, Grinnell's letter would violate § 8(a)(3) only if (1) Grinnell knew that its implementation of its final contract offer would amount to intolera- ble changes in working conditions and (2) it implemented the changes and sent the letter to discourage its employees' union activities.
 
 
 124
 I agree with the Board that the first element is lacking in this case. There is simply no evidence that Grinnell's implementation of its final contract offer was intended to force its employees to quit or that it created such intolerable working conditions as to make it foresee- able that the employees would quit. The final contract proposal did reduce the employees' wages and change their benefits, but, as the ALJ found, the resulting package was similar to that of Grinnell's nonunion workers. As such, I could not conclude that the implementation of the final contract proposal created intolerable working conditions.
 
 IV
 
 125
 Because I would conclude that the Board erred in finding that the negotiations between Grinnell and the Union had not reached an impasse on April 12, 1994, I would grant Grinnell's petition for review and deny the Board's cross-application for enforcement on the impasse issue and on the unfair labor practices stemming from the allegation that the parties had not reached an impasse. I would also deny the Union's cross-petition for review of the Board's finding that the April 13 letter did not amount to an effective discharge of employ- ees. We grant the Board's cross-application to enforce its order inso- far as it finds that Grinnell bargained in good faith up to the point at which it declared an impasse and that Grinnell did not constructively discharge its employees.
 
 
 126
 To this extent, and for the reasons given, I respectfully dissent.
 
 
 
 Notes:
 
 
 *
 While not evidence of whether, at the time, an impasse was properly declared, it is nevertheless worth noting that Grinnell attempted to pre- sent evidence before the ALJ that the parties continued to meet on three further occasions, after impasse was declared, to overcome the obstacle of targeting control and were unable to do so, notwithstanding the increased pressure exerted by the Union's strike.